UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– against –

TYRAN TROTTER,

Defendant.

15-CR-382

MEMORANDUM & ORDER

**JACK B. WEINSTEIN, Senior United States District Judge**

| Parties | Appearances |
|---|---|
| United States of America | **Lauren Howard Elbert**<br>United States Attorney's Office<br>271 Cadman Plz E<br>Brooklyn, NY 11201<br>718-254-6076 |
| Tyran Trotter | **Jeremy Schneider**<br>Rothman, Schneider, Soloway &<br>Stern, P.C.<br>100 Lafayette Street<br>Suite 501<br>New York, NY 10013<br>212-571-5500 |

**Table of Contents**

I.   Introduction ........................................................................................................ 3

   A.  Supervised Release ........................................................................................ 4

   B.  Marijuana and Supervised Release ................................................................ 6

   C.  Defendant Tyran Trotter ................................................................................ 7

II.  Facts ................................................................................................................. 8

   A.  Background .................................................................................................... 8

   B.  Underlying Charge ........................................................................................ 8

   C.  Sentence ......................................................................................................... 9

   D.  Violation Charge ........................................................................................... 9

   E.  Marijuana Legalization ................................................................................. 9

   F.  New York State and City Marijuana Decriminalization .............................. 10

   G.  Racial Disparities in Marijuana Enforcement ............................................. 12

III. Law .................................................................................................................. 13

   A.  Supervised Release: Origin and Purpose ..................................................... 13

      1.   Origin of Federal Supervised Release ................................................. 13

      2.   Rehabilitative Purpose of Supervised Release ................................... 15

   B.  Revocation of Supervised Release ............................................................... 16

   C.  Conditions of Supervised Release ............................................................... 20

      1.   Mandatory Conditions ......................................................................... 20

      2.   Standard Conditions ............................................................................ 22

      3.   Conditions for Specific Offense Types or Characteristics .................. 25

      4.   Case Law on Conditions ...................................................................... 29

      5.   Modification of Conditions .................................................................. 31

   D.  Early Termination of Supervised Release ..................................................... 31

      1.   Standard for Early Termination ........................................................... 31

      2.   Termination of Mandatory Minimum Periods ..................................... 33

   E.  Supervised Release in the Age of Marijuana Legalization and Widespread Use ................ 34

   F.  Critiques of Supervised Release .................................................................. 36

      1.   Overuse of Supervised Release ........................................................... 36

      2.   Negative Consequences ....................................................................... 37

      3.   Proposals for Change ........................................................................... 38

    4.      Probation Department Reforms ................................................................. 39

IV. Application of Law to Facts ................................................................. 40

  A.  3553(a) Factors ........................................................................... 41

  B.  Conduct of Defendant and Interests of Justice .................................... 41

V.  Conclusion ................................................................................. 42

I.     Introduction

This case raises serious issues about sentencing generally, and supervised release for marijuana users specifically: Are we imposing longer terms than are needed for effective supervised release? Should we stop punishing supervisees for a marijuana addiction or habit?

After revisiting and reconsidering these issues, I conclude: (1) I, like other trial judges, have in many cases imposed longer periods of supervised release than needed, and I, like other trial judges, have failed to terminate supervised release early in many cases where continuing supervision presents such a burden as to reduce the probability of rehabilitation; and (2) I, like other trial judges, have provided unnecessary conditions of supervised release and unjustifiably punished supervisees for their marijuana addiction, even though marijuana is widely used in the community and is an almost unbreakable addiction or habit for some. As a result of these errors in our sentencing practice, money and the time of our probation officers are wasted, and supervisees are unnecessarily burdened.

In summary, in this and my future cases I will: (1) impose shorter terms of supervised release as needed; (2) give greater consideration to the appropriateness of conditions; (3) provide for earlier termination where indicated; and (4) avoid violations of supervised release and punishment by incarceration merely for habitual marijuana use.

A. Supervised Release

The purpose of federal supervised release is to assist people who have served prison terms with rehabilitation and reintegration into the law-abiding community. The United States Probation Department ("Probation Department") monitors individuals on supervised release and can help a supervisee with his or her reintegration into lawful society by providing drug treatment, mental health counseling, vocational training, and many other services to help reduce recidivism.

Violating a condition of supervised release can lead to—and in instances must lead to—additional incarceration. This situation can trap some defendants, particularly substances abusers, in a cycle where they oscillate between supervised release and prison.

> [This is] the sinister side of probation the place where the promise of redemption is subverted by a lurking punitiveness. . . . Sanctions imposed for probation violations . . . frequently lead to disproportionate sentences, with probation merely becoming a staging area for eventual imprisonment.

Nora V. Demleitner, *How to Change the Philosophy and Practice of Probation and Supervised Release: Data Analytics, Cost Control, Focus on Reentry, and a Clear Mission*, 28 Fed. Sent'g Rep. 231, 232 (2016) (internal quotation marks omitted).

Connections with family and community organizations—religious or secular—are an aid to, and indication of, rehabilitation and reentry into normal, lawful life. *See generally* Mark T. Berg & Beth M. Huebner, *Reentry and the Ties That Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Just. Q. 382 (2011). Every time a connection is broken with the world outside of prison, by unnecessary incarceration following violations of supervised release, it probably becomes more difficult to reconnect. The court must consider such factors in finding violations during supervised release. *Cf. Reentry Program – Recidivism Reduction*,

Aleph Institute (June 25, 2018), https://aleph-institute.org/wp/programs/reentry-services/ (offering reentry programs and community connections to reduce recidivism).

The Probation Department in this court merits high praise for its work. Our probation officers do a difficult job well; often they have a helpful impact on criminal defendants' lives. Recognizing the possibility of over-supervision, our Probation Department has now taken measures to reduce supervision burdens by (1) tapering off supervision over time; (2) creating a "low intensity" supervision program; and (3) recommending early termination when warranted.

The resources of the Probation Department are limited. *Cf.* U.S. Courts, *Probation Offices Look to Technology to Offset Budget, Staffing Reductions* (Apr. 18, 2012) (discussing innovative measures taken by the Probation Department to offset budgetary concerns). The Probation Department should be focused on assisting those defendants with the potential for success, not on those doomed to fail.

The significance of terms and conditions of supervised release is often ignored when sentencing. *See generally* Christine S. Scott-Hayward, *Shadow Sentencing: The Imposition of Federal Supervised Release*, 18 Berkeley J. Crim. L. 180, 190 (2013). At the sentencing hearing, the term of supervised release is seldom discussed; defense counsel, Assistant United States Attorneys, and the court assume it will be imposed for a significant period (usually three or five years). The sentencing hearing centers on the incarceration term. Going forward, more careful attention should be given to the potential of supervised release, and its duration, to help—or to prevent—rehabilitation. Proposals of the American Law Institute to improve all aspects of sentencing are excellent, but generally beyond the powers of a trial judge to implement. *See* American Law Institute, Model Penal Code: Sentencing (Proposed Final Draft), § 6.09, at 197 (2017).

B.  Marijuana and Supervised Release

Without addressing the advantages and dangers of the change in criminal laws on smoking marijuana, it is obvious that marijuana use, through law, policy, and social custom, is becoming increasingly accepted by society.  Many people from all walks of life now use marijuana without fear of adverse legal consequences.  In New York, where marijuana policy is evolving in favor of decriminalization, serious racial and social-class disparities exist in the enforcement of anti-marijuana laws.  *See, e.g.*, Benjamin Mueller, Robert Gebeloff, & Sahil Chinoy, *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, N.Y. Times, May 13, 2018, at A1 (reporting that African Americans are arrested at eight times the rate of White people in New York City despite equal marijuana usage rates).

Yet, marijuana remains illegal for all purposes under federal law.  *See* Silvia Irimescu, *Marijuana Legalization: How Government Stagnation Hinders Legal Evolution and Harms A Nation*, 50 Gonz. L. Rev. 241, 249 (2015); *but cf.* Sadie Gurman & Natalie Andrews, *Jeff Sessions Struggles to Get Planned Marijuana Crackdown Going*, Wall St. J., June 10, 2018 (discussion of a "bipartisan bill" which would prevent the federal government from interfering with state laws legalizing marijuana).  Marijuana use violates a mandatory condition of federal supervised release and can require mandatory incarceration for some supervisees.  *See infra* Section III(B)-(E)

Effectively, courts are faced with a choice:  imprison a marijuana user on supervised release or cut short supervision, forcing an attempt at further rehabilitation on the supervisee's own.  Many men and women who have terms of incarceration imposed by this court are seeking to live productive, law-abiding lives, but are derailed by their marijuana addiction.

Like many federal trial judges, I have been terminating supervision for "violations" by individuals with long-term marijuana habits who are otherwise rehabilitated. No useful purpose is served through the continuation of supervised release for many defendants whose only illegal conduct is following the now largely socially acceptable habit of marijuana use. The cost to taxpayers of long, repeating sentences and extended, unnecessary supervised release is substantial.

### C. Defendant Tyran Trotter

Tyran Trotter, like many of his peers who fall into crime, comes from a broken home. He never knew his father. His mother struggles with drug addiction. His brother was apparently murdered. At fourteen he was placed in foster care. By sixteen he had half-a-dozen arrests on his record. He was convicted of a federal drug distribution charge and sentenced to two years imprisonment before he could legally drink alcohol. Now twenty-two years old, Trotter is on federal supervised release trying to lead a productive life, with a chronic problem holding him back: marijuana addiction.

Trotter began smoking marijuana when he was twelve years old. After serving his prison term, he has stayed out of trouble. Rehabilitation and reintegration into society are the most important roles the criminal justice system ought to play in his life. But, he should be returned to prison under prior practice because his marijuana use conflicts with federal law and the conditions of his supervision.

Supervised release is now being terminated by this court for Tyran Trotter. Its continuation would inhibit rehabilitation. He must attempt to lead a productive life on his own. As he himself put the matter:

> There's not a day that I don't wake up that I don't think about how I was one of the big shots and I had a lot of money and I was doing my thing and breaking the rules. It's hard coming home today and seeing my mother struggle. I'm trying to leave New York. I want a job for me. . . . [w]hether Probation was here or not.

May 31, 2018 Hr'g Tr. 9:4-13 ("Hr'g Tr.").

II.    Facts

A.  Background

Trotter was born in 1996 in Queens, New York.  Presentence Investigative Report ("PSR") at ¶ 69.  For the first fourteen years of his life he lived with his mother, but when she lost her job and family home in 2010 because of her addiction, Trotter and his brothers were placed in foster care.  *Id.* at ¶ 71.  After several months in foster care, he moved into a group home where he lived for two years.  *Id.*

Trotter abandoned school before completing the seventh grade.  *Id.* at ¶ 83.  But he has a good mind.  While incarcerated in 2013, he earned his General Educational Development diploma.  *Id.* at ¶ 82.

Before his arrest for the offense leading to the present conviction, he did not have a stable place to live:  he resided—on a "catch as a catch can"—with friends, family members, and his former girlfriend.  *Id.*

B.  Underlying Charge

On July 14, 2016, Trotter pled guilty to one count of conspiracy to distribute heroin.  *See* 21 U.S.C. §§ 846 and 841(b)(1)(C); Plea Hr'g Tr., ECF No. 260, July 14, 2016.

He participated in a street gang called "Paper Chasing Goons" that acted as a drug trafficking organization ("DTO").  PSR at ¶ 2.  The DTO had access to narcotics and firearms, and distributed heroin to a network of drug traffickers who sold it to users.  *Id.* at ¶¶ 2-3.

Between November 2014 and July 2015, Trotter conspired to distribute at least 400 grams of heroin.  There is no evidence that he possessed or used a firearm.  *Id.* at ¶¶ 8-9.

### C. Sentence

Trotter was sentenced to two years imprisonment. *See* Oct. 7 Sent. Hr'g Tr. No fine was imposed in light of his inability to pay one. *See id*.; PSR at ¶ 87.

A three year term of supervised release was imposed. *See* Oct. 7 Sent. Hr'g Tr. It was the mandatory minimum. *See* 21 U.S.C. § 841(b)(1)(C) ("[A]ny sentence imposing a term of imprisonment under this paragraph shall . . . impose a term of supervised release of at least 3 years."). The maximum term is lifetime supervision. *See United States v. Breton,* 672 F. App'x 108, 109 n.3 (2d Cir. 2016).

### D. Violation Charge

The United States Probation Department reported that Trotter had violated the terms of supervised release by using marijuana and failing to comply with its drug treatment orders. *See* Violation of Supervised Release Report, ECF No. 505, Dec. 14, 2017. An additional four months incarceration was recommended by the Probation Department to be followed by an additional two years of supervised release. *Id*. at 11-12.

Trotter pled not guilty to the violation charges. *See* Minute Entry for Initial Appearance, ECF No. 512, Jan. 30, 2018. Preliminary hearings were held on February 7, 2018 and May 31, 2018. *See* Minute Entry for Preliminary Hearing, ECF No. 520; Hr'g Tr. No ruling on the issue of use was made.

### E. Marijuana Legalization

Under federal law, marijuana is a schedule I drug, meaning it has potential for abuse and has no accepted medical purpose. *See* Silvia Irimescu, *Marijuana Legalization: How Government Stagnation Hinders Legal Evolution and Harms A Nation*, 50 Gonz. L. Rev. 241,

249 (2015).  Possession, use, and cultivation of marijuana has been outlawed by Congress pursuant to its Commerce Clause power.  *See Gonzales v. Raich*, 545 U.S. 1 (2005).

As already noted, states are departing from the federal approach.  In the majority of states—twenty-nine—marijuana may be used medicinally.  *See* Melia Robinson, Jeremy Berke, & Skye Gould, *This Map Shows Every State that has Legalized Marijuana*, Business Insider, Apr. 20, 2018.  In nine states and the District of Columbia, marijuana may be used recreationally.  *Id*.

The trend in public opinion is in favor of legalization by state law.  A Pew Research Center study found that in 2018, 61% of Americans believe that marijuana use should be legal. Abigail Geiger, *About Six-in-Ten Americans Support Marijuana Legalization*, Pew Research Center, Jan. 5, 2018, http://www.pewresearch.org/fact-tank/2018/01/05/americans-support-marijuana-legalization.  This is a sharp increase from previous years: in 1969 only 12% of Americans supported legalization; 32% were in favor of it in 2010.  *Id*.  Younger generations, so-called "Milennials" and "Gen Xers," support legalizations at rates of 70% and 66%, respectively. *Id*.; *Cf*. German Lopez, *Canada just legalized marijuana. That has big implications for US drug policy.*, Vox, June 20, 2018 (discussing Canadian marijuana legalization).

F.   New York State and City Marijuana Decriminalization

States and municipalities have "decriminalized" marijuana use.  German Lopez, *The Spread of Marijuana Legalization Explained*, Vox, Apr. 20, 2018.  "Decriminalization" in this context has no standardized meaning—in some places, possession is no longer punished, but distribution is; in others, marijuana possession is punished with a small fine.  *Id*.

New York City's decriminalization has been through systemic non-enforcement of marijuana laws.  *See* Andrew Denney, *DAs in NYC and Area Take Diverging Views on*

*Marijuana Decriminalization*, N.Y.L.J., May 24, 2018.  In 2014, the Brooklyn District Attorney stopped prosecuting low-level marijuana possession.  *Id.*  The Manhattan District Attorney's Office has announced that in August of 2018 it will stop prosecuting low-level marijuana cases. Colby Hamilton, *City Officials Announce Shifts in Marijuana Enforcement Policies*, N.Y.L.J., May 16, 2018.

The Mayor of New York City has expressed the view that recreational marijuana legalization is inevitable in New York and he has asked the New York City Police Department ("NYPD") to stop making marijuana arrests.  Denney, *supra*.  The NYPD's Commissioner convened a working group to study marijuana enforcement, stating "[t]he NYPD has no interest in arresting New Yorkers for marijuana offenses when those arrests have no impact on public safety."  *Id.*  The City announced on June 19, 2018 that it would issue criminal summonses for, rather than arresting, most individuals caught smoking marijuana in public.  Jonathan Wolfe, *Marijuana in New York: Here's How the Laws Are Changing*, N.Y. Times, June 20, 2018. Some, including people on parole or probation, will still be subject to arrest.  *Id.*

At the state level, the Governor of New York commissioned a report on recreational marijuana that recommended legalization.  Jesse McKinley & Benjamin Mueller, *New York Moves Toward Legal Marijuana With Health Dept. Consent*, N.Y. Times, June 18, 2018, at A17. It is uncertain whether this report will lead to a change in state law.  *Id.*  New York State legalized marijuana for medicinal use in 2014.  *Id.*

Despite changes in public opinion, state law, and municipal policy, Probation Department policy requires officers to treat marijuana in the same way as other unlawful drugs.  *See* Letter from Joe Gergits, Assistant General Counsel for the Administrative Office of the United States Courts to Jonathan Hurting, United States Probation (July 20, 2009) ("State laws that

decriminalize marijuana have no legal effect on how officers should interpret drug use or possession under Federal law. Even when States have legalized marijuana possession for compassionate medicinal use, the Federal prohibitions against possession and distribution remain in effect. . . . Nonetheless, I anticipate that evolving views on the medicinal use of marijuana and State decriminalization and legalization of the possession of small amounts will influence the exercise of Federal prosecutorial and judicial sentencing discretion.").

G. Racial Disparities in Marijuana Enforcement

A leading commentator on "mass incarceration" in the United States explained the sharp racial and social disparities in enforcement of anti-marijuana laws:

> Adding to the temptation to avoid race is the fact that opportunities for challenging mass incarceration on race-neutral grounds have never been greater. . . . Some states have decriminalized marijuana, including Massachusetts, where 65 percent of state voters approved the message. . . . [I]mpressive changes in our nation's drug laws and policies would be not only possible, but likely, without ever saying a word about race. . . . The prevailing caste system cannot be successfully dismantled with a purely race-neutral approach.

Michelle Alexander, *The New Jim Crow* 226 (2010); *see also United States v. Bannister*, 786 F. Supp. 2d 617, 651-53 (E.D.N.Y. 2011) (discussing racial disparities in drug sentences).

Nationwide, African Americans are 3.73 times more likely to be arrested for marijuana possession than White people, despite similar usage rates. *See* ACLU, The War on Marijuana 17, 21 (June 2013). In the period between 2001 and 2010, the disparity increased. *Id.* at 20.

In New York City, African Americans were eight times more likely than White people to be arrested for marijuana possession. Benjamin Mueller, Robert Gebeloff & Sahil Chinoy, *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, N.Y. Times, May 13, 2018, at A1. There has been an attempt to explain this disparity by suggesting that more complaints are lodged in Black and Hispanic communities than in largely White areas. *Id.* But a

New York Times' report found that "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents." *Id*.

In this court, the majority of supervisees who face a violation charge for marijuana use are African Americans. The arrest disparities in New York City may partially account for this imbalance.

It is a mandatory condition of supervised release that a supervisee may not violate state or federal law. *See infra* Section III(C)(1). A supervisee arrested by the state for marijuana possession may thus face both the state charge and a parallel violation of the terms of supervised release charge in the federal court. Since an African American is eight times more likely to be arrested for marijuana use, his or her chance of a supervised release violation for marijuana is much greater than a White person's.

III.    Law

    A.  Supervised Release: Origin and Purpose

        1.  Origin of Federal Supervised Release

The Sentencing Reform Act of 1984 (the "Act" or "SRA") sought to introduce uniformity and consistency in federal sentencing. *See generally* Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420 (2008). It created the United States Sentencing Commission and Federal Sentencing Guidelines. *Id*. at 1427-34. It abolished federal parole and created supervised release. Christine S. Scott-Hayward, *Shadow Sentencing: The Imposition of Federal Supervised Release*, 18 Berkeley J. Crim. L. 180, 190 (2013).

The switch to supervised release was made in part as a response to criticism that the parole system enhanced the indeterminate sentencing structure—creating a lack of uniformity, transparency, and predictability in the criminal justice system. *Id.*; Fiona Doherty, *Indeterminate Sentencing Returns: The Invention of Supervised Release*, 88 N.Y.U. L. Rev. 958, 992 (2013). "A growing consensus emerged that a system premised on coercive rehabilitation was fatally flawed—and that parole worked against minorities and the poor." *Id*. at 991. Some believed that judges imposed higher sentences so "that the earliest parole date would coincide with the sentence length the judge believed the defendant deserved." Mica Moore, *Escaping from Release: Is Supervised Release Custodial under 18 USC § 751(a)?*, 83 U. Chi. L. Rev. 2257, 2260-61 (2016).

Parole cut short an individual's prison sentence by a parole board's exercise of its discretion; supervised release is ordered at sentencing by a judge for a defined term. Supervised release is designed to assist with rehabilitation, not to punish:

> Only deterrence and treatment were originally specified as purposes for courts to consider when imposing supervised release. Supervised release was not intended to be imposed for the purposes of punishment or incapacitation, since those purposes will have been served to the extent necessary by the term of imprisonment. For this reason, Congress initially declined to provide for the possibility of revocation, stating that "it does not believe that a minor violation of a condition of supervised release should result in resentencing of the defendant. Instead, compliance with the conditions of supervised release would be enforced through the use of contempt proceedings, but only after repeated or serious violations of the conditions of supervised release. If an individual committed a new crime, then new charges should be filed.

> However, as a result of changes in the political climate, and skepticism from probation officers and prosecutors, that approach soon changed. Before the SRA even took effect, Congress passed the Anti-Drug Abuse Act of 1986. This Act provided for mandatory terms of supervised release for certain drug offenses, and amended the supervised release statute, establishing revocation and reimprisonment for violations of supervised release conditions.

Scott-Hayward, *supra*, at 191-92 (internal quotation marks removed).

In most cases, supervised release was not designed by Congress to be mandatory. *Id.*

Courts consider the factors set forth in 18 U.S.C. § 3553(a) to determine which defendants would

benefit from the rehabilitative purpose of supervised release. *Id.* at 192-93.

> 2. Rehabilitative Purpose of Supervised Release

The Supreme Court has recognized that "supervised release fulfills *rehabilitative ends*,

distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000)

(emphasis added). "Supervised release, in contrast to probation, *is not a punishment* in lieu of

incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994) (emphasis added).

> Supervised release is not an alternative to incarceration, but a separate and
> additional period of monitoring concerned with facilitating the *reintegration of the
> defendant into the community* . . . supervised release must follow imprisonment; it
> cannot be imposed on its own. These differences reflect the rehabilitative character
> of release by fully disaggregating the punitive and transitional phases of a
> defendant's sentence.

Moore, *supra*, at 2263 (emphasis added).

A congressional statement of policy accompanying the SRA succinctly stated the

rehabilitative purpose of supervised release:

> [T]he primary goal of [Supervised Release] is to ease the defendant's transition
> into the community after the service of a long prison term for a particularly
> serious offense, or to provide rehabilitation to a defendant who has spent a fairly
> short period in prison for punishment or other purposes but still needs supervision
> and training programs after release.

S. Rep. No. 98-225, at 124 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3307.

Conditions of supervised release reflect its rehabilitative goal. For example, the court

may require participation in substance abuse or mental health treatment, and the probation

department can help a supervisee find a job. Doherty, *supra*, at 1012-13. Courts must consider

"provid[ing] the defendant with needed education or vocational training, medical care, or other

correctional treatment." 18 U.S.C. § 3553(a)(2)(D).

B.  Revocation of Supervised Release

Although the idea of revocation as punishment for the supervisee's failure to follow

Probation's instructions is foreign to the purpose of supervised release, it was included in the

statute.  Revocation was originally introduced by Senator Strom Thurmond, in 1985, and was

adopted as a "technical" change contained within the Anti-Drug Abuse Act of 1986 ("ADAA").

Doherty, *supra*, at 1000.

> With this "technical amendment" and the revocation mechanism it created,
> Congress brought back conditional release. In enacting the ADAA, however, little
> consideration seems to have been given to the conceptual differences between
> supervised release and probation incorporated into the SRA. The adoption of the
> revocation mechanism did not even warrant a separate header to draw attention to
> the change. . . .
>
> For those accustomed to parole and probation, the absence of a revocation
> mechanism for supervised release seemed like an "impractical oddit[y]." Many
> actors in the system wondered how supervised release could be effective unless
> courts and probation officers were granted systematic leverage over offenders. And
> leverage had always meant prison.
>
> Procedurally, the ADAA grafted the revocation mechanism for probation onto
> supervised release, ignoring the different theoretical roots of those systems.
> Judges could now "revoke" a term of supervised release after finding, by a simple
> preponderance of the evidence, that the person had violated a condition of
> supervision. There was to be no trial and no jury; courts were to apply the same
> rules of diluted procedure applicable to parole and probation revocation hearings.

*Id*. at 1001.

The term "revoke" appears to be somewhat of a misnomer.  Parole was based on early

release from prison—by the grace of the parole board a person was conditionally released from

prison, and the leniency could be "revoked."  *Id*. at 985.  A person on supervised release has

completed his or her prison term and is serving an independent term of supervision separately

ordered by the court.  Supervised release is not being "revoked"; rather, a supervisee is being

punished for violating conditions and for the individual or general deterrence of the punishment.

A conceptual oddity exists:

> The supervised release statute continued to instruct judges not to consider the goals of punishment and incapacitation when deciding whether to impose—and now revoke—supervised release. And yet, the possibility of revocation made supervised release indisputably about punishment, oversight, and coercion. Judges and probation officers were to gauge how well released prisoners were adjusting with the threat of more prison hanging overhead. Despite the statutory bar on punishment, people on supervised release could now be sent back to prison for conduct that did not even violate a federal criminal statute.

*Id*. at 1002.

Notwithstanding its shaky theoretical underpinnings, revocation proceedings are central to federal supervised release. A violation proved by a mere preponderance, rather than beyond a reasonable doubt, can result in substantial time in prison. The statute provides:

> The Court may . . . revoke a term of supervised release, and require the defendant to *serve in prison* all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, . . . finds by a *preponderance of the evidence* that the defendant violated a condition of supervised release. . . .

18 U.S.C. § 3583(e)(3) (emphasis added).

In addition to this general permissive revocation provision, a separate section provides that certain offenses *require* revocation and imprisonment:

> If the defendant—
>
> (1) possesses [marijuana or another] *controlled substance* in violation of the condition set forth in subsection (d);
> (2) possesses a firearm, as such term is defined in section 921 of this title, in violation of Federal law, or otherwise violates a condition of supervised release prohibiting the defendant from possessing a firearm;
> (3) refuses to comply with *drug testing* imposed as a condition of supervised release; or
> (4) as a part of *drug testing*, *tests positive for illegal controlled substances more than 3 times over the course of 1 year*;

the court *shall* revoke the term of supervised release and require the defendant to *serve a term of imprisonment* not to exceed the maximum term of imprisonment authorized under subsection (e)(3).

18 U.S.C. § 3583(g) (emphasis added).

Subdivision (d) of § 3583 emphasizes the supervisee's obligation to refrain from using drugs:

The court *shall order*, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision, that the defendant make restitution in accordance with sections 3663 and 3663A, or any other statute authorizing a sentence of restitution, and that the defendant *not unlawfully possess a controlled substance*. . . .

The court *shall also order*, as an explicit condition of supervised release, that the defendant refrain from any *unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance.* . . . The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test. A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy. The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.

18 U.S.C. § 3583(d) (emphasis added).

Nearly all violations are subject to permissive revocation. Drug use, however, *requires* a supervisee to be placed back in prison, using three separate mechanism: drug possession, testing positive for drugs, or refusing a drug test. *Cf.* Jan Hoffman, *She Went to Jail for a Drug Relapse. Tough Love or Too Harsh?*, N.Y. Times, June 4, 2018, at A1 ("Should an addict's relapse be punished with a criminal sanction? Ms. Eldred has put that question before the Massachusetts

Supreme Judicial Court, in a case that may have widespread ripples, as hundreds of thousands of addicted people tumble into the criminal justice system. Remaining drug-free is an almost universal requirement of probation. Violating it can bring sanctions ranging from a warning to, frequently, jail.").

In the Eastern District of New York, 13.45% of revocations are related to drug use, despite the Probation Department's best efforts to use sanctions short of incarceration for habitual drug users. *See* Letter of Eileen Kelly, Chief U.S. Probation Officer, ECF No. 540, June 15, 2018 ("[I]t is important to note, that our revocation rate is significantly lower than our non-compliance rate. As you [,the sentencing judge in the instant case,] well know, officers and Judges exhaust other remedies, including treatment and intermediary sanctions long before an offender is violated and or revoked.").

District judges overwhelmingly believe that mandatory revocation for drug use is not desirable. The United States Sentencing Commission surveyed district judges in 2014 about supervised release. *See* United States Sentencing Commission, *Results of 2014 Survey of United States District Judges Modification and Revocation of Probation and Supervised Release* (2015). Judges were asked to state their position and responded as follows:

**Table 11. Mandatory Bases for Revocation.** The current statutory scheme governing probation and supervised release violations includes the following five bases for mandatory revocation of probation or supervised release (subject to a limited exception for drug-related violations). In your opinion, should any of the following five types of violations require mandatory revocation under the statute?

| | Percent Responding | | Number Responding | Number Missing |
|---|---|---|---|---|
| Bases for revocation | Yes | No | | |
| Table 11a. Illegal possession of a firearm | 66% | 34% | 677 | 21 |
| Table 11b. Illegal possession of a controlled substance | 15% | 85% | 668 | 30 |
| Table 11c. Failing more than 3 drug tests in one year | 26% | 74% | 666 | 32 |
| Table 11d. Refusal to take a drug test | 38% | 62% | 664 | 34 |
| Table 11e. For a sex offender on supervised release, the commission of a sex offense or kidnapping | 87% | 13% | 678 | 20 |

*Id.* at 12.

Given judges' antipathy towards mandatory revocation, it is not surprising that 59% of those surveyed believed that the United States Sentencing Commission should significantly revise the supervised release guidelines to provide more alternatives to incarceration for violations. *Id.* at 6. In near unanimity—94%—judges requested sentencing recommendations short of incarceration that could be imposed through modification of the conditions of supervision. *Id.* at 11.

### C. Conditions of Supervised Release

Set out below is a brief survey of recommended conditions of supervised release that will be considered in giving greater attention to supervised release. As Judge Posner noted:

> Apart from a handful of conditions required by the Sentencing Reform Act itself, conditions of supervised release are discretionary. Some of the discretionary conditions are designated as "standard," others are called "special conditions" of supervised release, and are recommended for particular offenses. . . .
>
> [T]here are serious problems with how some district judges are handling discretionary conditions of supervised release at sentencing. Two of the problems are relatively minor, and we mention them quickly to get them out of the way. One is the number—thirty [although now slightly reduced]—and the other the variety of the listed discretionary conditions. The sheer number may induce haste in the judge's evaluation of the probation service's recommendations and is doubtless a factor in the frequent failure of judges to apply the sentencing factors in section 3553(a) to all the recommended conditions included in the sentence. . . . A more serious problem with the current system is that . . . a number of the listed conditions, along with a number of conditions that judges modify or invent, are vague.

*United States v. Siegel*, 753 F.3d 705, 707-08 (7th Cir. 2014) (internal citations omitted).

### 1. Mandatory Conditions

Six conditions are required in all cases. *See* 18 USC § 3583(d). Two additional mandatory conditions apply in certain categories of cases. They are outlined below:

| Mandatory in All Cases | | | |
|---|---|---|---|
| | **Condition** | **Statute** | **Guideline** |
| 1. | **New Crime**<br>The defendant shall not commit another federal, state or local offense | 18 USC § 3583(d) | § 5D1.3 (a)(1) |
| 2. | **Drug Possession**<br>The defendant shall not unlawfully possess a controlled substance | 18 USC § 3583(d) | § 5D1.3 (a)(2) |
| 3. | **Drug Use / Testing**<br>The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on probation and at least two periodic drug tests thereafter (as determined by the court) for use of a controlled substance | 18 USC § 3583(d) | § 5D1.3 (a)(4) |
| 4. | **Fine**<br>If a fine is imposed and had not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay the fine | 18 USC § 3583(d) | § 5D1.3 (a)(5) |
| 5. | **Restitution**<br>The defendant shall make restitution in accordance with 18 USC §§ 2248, 2259, 2264, 2327, 3663, 3664 and pay the assessment imposed in accordance with 18 USC § 3013 If there is a court-established payment schedule for making restitution or paying the assessment (18 USC § 3572(d)), the defendant shall adhere to the schedule | 18 USC § 3583(d) | § 5D1.3 (a)(6) |
| 6. | **DNA Collection**<br>The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the United State Probation Office if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (42 USC § 14135a) | 18 USC § 3583(d) | § 5D1.3 (a)(8) |
| Mandatory in Specific Cases | | | |
| 7. | **Sex Offender Registration**<br>If the defendant is required to register under the Sex Offender Registration and | 18 USC § 3583(d) | § 5D1.3 (a)(7) |

| | | | |
|---|---|---|---|
| | Notification Act, the defendant shall comply with the requirements of that Act | | |
| 8. | **Domestic Violence Program** The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. § 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, | 18 USC § 3583(d) | § 5D1.3 (a)(3) |

*See* U.S. Sentencing Commission, *Supervised Release*, Appendix A, at 16-17 (April 2017).

### 2. Standard Conditions

In addition to mandating conditions, the statue provides:

> The court may order, as a further condition of supervised release, to the extent that such condition—
>
> > (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D) [*see infra* Section III(D)(1)];
> > (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and
> > (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);
>
> any condition set forth as a discretionary condition of probation in section 3563(b) [*see infra*] and any other condition it considers to be appropriate.

The Sentencing Commission recommends thirteen conditions as "standard conditions" of

supervised release. Labeling the conditions "standard" does not mean that they are required.

> All discretionary conditions of supervised release must . . . comply with overall federal sentencing policy as stated in 18 U.S.C. § 3553(a), especially subsection (a)(2), which requires the judge to consider "the need for the sentence imposed— (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*United States v. Siegel*, 753 F.3d 705, 707 (7th Cir. 2014).

To the extent that the standard conditions are administrative, however, the Court of Appeals for the Second Circuit has stated that they are "essential to the functioning of the supervised release system[;] they are almost uniformly imposed by the district courts and have become boilerplate." *United States v. Truscello*, 168 F.3d 61, 63 (2d Cir. 1999) (internal citations and quotation marks omitted). "Implicit in the very nature of supervised release is that certain conditions are necessary to effect its purpose." *Id*. at 62. "[M]any of the standard conditions are so clearly necessary to supervised release, that the term 'discretionary' may be a misleading, if technically accurate, modifier for the standard conditions." *Id*. at 63; *but see* Michael P. Kenstowicz, *The Imposition of Discretionary Supervised Release Conditions: Nudging Judges to Follow the Law*, 82 U. Chi. L. Rev. 1411, 1411-12 (2015) ("[J]udges are required by 18 USC § 3553(a) to independently weigh the imposition of discretionary conditions . . . sentencing judges regularly fail to fulfill this legal duty . . . [i]n particular, judges appear to frequently impose thirteen discretionary conditions recommended by the United States Sentencing Commission—called 'standard conditions'—without considering whether they enhance public safety or rehabilitation in each case. This practice is troubling because Congress intended supervised release to be curative, not punitive.").

The following chart lists the standard conditions:

| Standard Conditions | | | |
|---|---|---|---|
| | **Condition** | **Statutory Authority** | **Sentencing Guidelines** |
| 1. | **Reporting after Prison**<br>The defendant shall report to the probation office in the federal judicial district where he or she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame | 18 USC § 3563(b)(15) | § 5D1.3 (c)(1) |
| 2. | **Continued Reporting** | | § 5D1.3 (c)(2) |

| | | | |
|---|---|---|---|
| | After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed | | |
| 3. | **Travel**<br>The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer | 18 USC § 3563(b)(14) | § 5D1.3 (c)(3) |
| 4. | **Candor**<br>The defendant shall answer truthfully the questions asked by the probation officer | 18 USC § 3563(b)(17) | § 5D1.3 (c)(4) |
| 5. | **Living Arrangements**<br>The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he or she lives or anything about his or her living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change | 18 USC § 3563(b)(13) & (b)(17) | § 5D1.3 (c)(5) |
| 6. | **Search**<br>The defendant shall allow the probation officer to visit the defendant at any time at his or her home or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view | 18 USC § 3563(b)(16) | § 5D1.3 (c)(6) |
| 7. | **Employment**<br>The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment he or she shall try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about his or her work (such as the position or the job responsibilities), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the | 18 USC § 3563(b)(4) & (b)(17) | § 5D1.3 (c)(7) |

| | | | |
|---|---|---|---|
| | defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change | | |
| 8. | **Criminal Association** The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer | 18 USC § 3563(b)(6) | § 5D1.3 (c)(8) |
| 9. | **Arrest Reporting** If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within 72 hours | 18 USC § 3563(b)(18) | § 5D1.3 (c)(9) |
| 10. | **Firearm** The defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon | 18 USC § 3563(b)(8) | § 5D1.3 (c)(10) |
| 11. | **Informant** The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court | | § 5D1.3 (c)(11) |
| 12. | **Risk Notification** If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk | | § 5D1.3 (c)(12) |
| 13. | **Probations Directives** The defendant shall follow the instructions of the probation officer related to the conditions of supervision | | § 5D1.3 (c)(13) |

*See* U.S. Sentencing Commission, *Supervised Release*, Appendix A, at 17-18 (April 2017).

3.  Conditions for Specific Offense Types or Characteristics

The Sentencing Commission recommends that certain conditions be implemented based on the specific type of offense or characteristics of the defendant.

| Special Conditions | | | |
|---|---|---|---|
| **Circumstance** | **Condition** | **Statutory Authority** | **Sentencing Guidelines** |
| **Dependents and Child Support** | If the defendant has one or more dependents—a condition specifying that the defendant shall support his or her dependents | | § 5D1.3 (d)(1)(A) |
| | If the defendant is ordered by the government to make child support payments or to make payments to support a person caring for a child—a condition specifying that the defendant shall make the payments and comply with the other terms of the order | | § 5D1.3 (d)(1)(B) |
| **Debt Obligations** | If an installment schedule of payment of restitution or a fine is imposed — a condition prohibiting the defendant from incurring new credit charges or opening additional lines of credit without approval of the probation officer unless the defendant is in compliance with the payment schedule | | § 5D1.3 (d)(2) |
| **Access to Financial Information** | If the court imposes an order of restitution, forfeiture, or notice to victims, or orders the defendant to pay a fine—a condition requiring the defendant to provide the probation officer access to any requested financial information | | § 5D1.3 (d)(3) |
| **Substance Abuse** | If the court has reason to believe that the defendant is an abuser of narcotics, other controlled substances or alcohol—(A) a condition requiring the defendant to participate in a program approved by the United States Probation Office for substance abuse, which program may include testing to determine whether the defendant has reverted to the use of drugs or alcohol; and (B) a condition specifying that the defendant shall not use or possess alcohol | 18 USC § 3563(b)(9) | § 5D1.3 (d)(4) |
| **Mental Health** | If the court has reason to believe that the defendant is in need of psychological or psychiatric treatment—a condition requiring that | 18 USC § 3563(b)(9) | § 5D1.3 (d)(5) |

| | | | |
|---|---|---|---|
| | the defendant participate in a mental health program approved by the United States Probation Office | | |
| **Deportation** | If (A) the defendant and the United States entered into a stipulation of deportation pursuant to section 238(c)(5) of the Immigration and Nationality Act (8 U.S.C. § 1228(c)(5)); or (B) in the absence of a stipulation of deportation, if, after notice and hearing pursuant to such section, the Attorney General demonstrates by clear and convincing evidence that the alien is deportable — a condition ordering deportation by a United States district court or a United States magistrate judge | | § 5D1.3 (d)(6) |
| **Sex Offenses** | If the instant offense of conviction is a sex offense, | | § 5D1.3 (d)(7) |
| | | A condition requiring the defendant to participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders | § 5D1.3 (d)(7)(A) |
| | | A condition limiting the use of a computer or an interactive computer service in cases in which the defendant used such items | § 5D1.3 (d)(7)(B) |
| | | A condition requiring the defendant to submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or | § 5D1.3 (d)(7)(C) |

| | | | |
|---|---|---|---|
| | | by any probation officer in the lawful discharge of the officer's supervision functions | | |
| **Unpaid Restitution, Fines, or Special Assessments** | If the defendant has any unpaid amount of restitution, fines, or special assessments, the defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay | | § 5D1.3 (d)(8) |
| **Additional Conditions: Case-by-Case Basis** | **Community Confinement** Residence in a community treatment center, halfway house or similar facility may be imposed as a condition of supervised release | 18 USC § 3563(b)(11) | § 5D1.3 (e)(1) |
| | **Home Detention** Home detention may be imposed as a condition of supervised release, but only as a substitute for imprisonment | | § 5D1.3 (e)(2) |
| | **Community Service** Community service may be imposed as a condition of supervised release | 18 USC § 3563(b)(12) | § 5D1.3 (e)(3) |
| | **Occupational Restrictions** Occupational restrictions may be imposed as a condition of supervised release *see infra* Section III(C)(3) | 18 USC § 3563(b)(5) | § 5D1.3 (e)(4) |
| | **Curfew** A condition imposing a curfew may be imposed if the court concludes that restricting the defendant to his place of residence during evening and nighttime hours is necessary to protect the public from crimes that the defendant might commit during those hours, or to assist in the rehabilitation of the defendant. Electronic monitoring may be used as a means of surveillance to ensure compliance with a curfew order | 18 USC § 3563(b)(19) | § 5D1.3 (e)(5) |
| | **Intermittent Confinement** Intermittent confinement (custody for intervals of time) may be ordered as a condition of supervised release during the first year of supervised release, but only for a violation of a condition of supervised release in accordance with | | § 5D1.3 (e)(6) |

| | 18 U.S.C. § 3583(e)(2) and only when facilities are available | | |
| --- | --- | --- | --- |

U.S. Sentencing Commission, *Supervised Release*, Appendix A, at 19-20 (April 2017).

### 4.   Case Law on Conditions

Courts may craft "special" conditions of supervised release as appropriate.  Sentencing courts have "wide latitude" in doing so.  *United States v. Reeves*, 591 F.3d 77, 80 (2d Cir. 2010). Below are some parameters set by the Court of Appeals for the Second Circuit; a review of other circuits has not been conducted.

Conditions must not be overly vague.  *See, e.g., United States v. Green*, 618 F.3d 120, 124 (2d Cir. 2010) (holding that a condition prohibiting a defendant from "wearing [] colors, insignia, or obtaining tattoos or burn marks (including branding and scars) relative to [criminal street] gangs,'" was "impermissibly vague"); 18 U.S.C. § 3583(f) ("The court shall direct that the probation officer provide the defendant with a written statement that sets forth all the conditions to which the term of supervised release is subject, and that is sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required.").

The United States Constitution constrains a sentencing court's discretion.  *See, e.g*., *United States v. Myers*, 426 F.3d 117, 126 (2d Cir. 2005) ("[W]hen a fundamental liberty interest is implicated by a sentencing condition, we must first consider the sentencing goal to which the condition relates . . .[w]e must then consider whether it represents a greater deprivation of liberty than is necessary to achieve that goal."); *United States v. Lifshitz*, 369 F.3d 173, 190 (2d Cir. 2004) (evaluating a search condition under the Fourth Amendment "special needs" doctrine); *United States v. Hernandez*, 209 F. Supp. 3d 542 (E.D.N.Y. 2016) (holding that a condition prohibiting a person convicted of possessing child pornography from attending a church service was unconstitutional as applied under the First Amendment).

Restrictions on internet use must be narrowly tailored. *See, e.g.*, *United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir. 2002) ("Although the condition prohibiting Sofsky from accessing a computer or the Internet without his probation officer's approval is reasonably related to the purposes of his sentencing, in light of the nature of his offense, we hold that the condition inflicts a greater deprivation on Sofsky's liberty than is reasonably necessary."); *cf. United States v. Bello*, 310 F.3d 56 (2d Cir. 2002) (finding that a bar on watching television during probation was impermissible).

Limits have been placed on conditions of supervised release that may inhibit a defendant's employment prospects. *See United States v. Doe*, 79 F.3d 1309, 1319 (2d Cir. 1996) ("[W]e carefully scrutinize unusual and severe conditions, such as one requiring the defendant to give up a lawful livelihood.") (internal quotation marks omitted). The Sentencing Guidelines suggest "(1) a reasonably direct relationship existed between the defendant's occupation . . . and the conduct relevant to the offense of conviction; and (2) imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. 5F1.5; *United States v. Lombardi*, No. 17-356-CR, 2018 WL 1415138, at *2 -- Fed.Appx.-- (2d Cir. Mar. 22, 2018) (applying the guidelines).

Given the rehabilitative purpose of supervised release and the strong relationship between gainful employment and recidivism, conditions that may affect employment prospects can be particularly troubling. *Cf.* Mark T. Berg & Beth M. Huebner, *Reentry and the Ties That Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 Just. Q. 382 (2011); *United States v. Jenkins*, 854 F.3d 181, 195 (2d Cir. 2017) (vacating condition of supervised release

where "the nature of these employment restrictions mean that, as a practical matter, [the defendant] may never be employable").

### 5. Modification of Conditions

Conditions of Supervised Release are imposed at the sentencing hearing. A court may, however, "modify, reduce, or enlarge the conditions of supervised release, at any time prior to the expiration or termination of the term of supervised release . . . ." 18 U.S.C. § 3583(e)(2). Prior to modification, the court must consider the factors listed in 18 U.S.C. § 3553(a) and hold a hearing. *See id.*; *infra* Section III(D); Fed. R. Crim. P. 32.1.

## D. Early Termination of Supervised Release

### 1. Standard for Early Termination

Supervised release may be terminated early. "The court may . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is [1] warranted by the conduct of the defendant released and [2] the interest of justice." 18 U.S.C. § 3583(e)(1). The court must consider several factors in deciding on early termination:

(i)  "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1);

(ii)  the need for the sentence imposed "to afford adequate deterrence to criminal conduct," *id.* § 3553(a)(2)(B), "to protect the public from further crimes of the defendant," *id.* § 3553(a)(2)(C), and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," *id.* § 3553(a)(2)(D);

(iii)  the "kinds of sentence and the sentencing range established for the applicable category of offense [or violation of probation or supervised release] committed by the applicable category of defendant" under the Sentencing Guidelines, *id.* § 3553(a)(4);

(iv)  "any pertinent policy statement issued by the Sentencing Commission," *id.* § 3553(a)(5); and

(v)    "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct...." *Id.* § 3553(a)(6).

*United States v. Lussier*, 104 F.3d 32, 35 (2d Cir. 1997).  "The decision whether to grant early termination rests within the discretion of the district court."  *United States v. Harris*, 689 F. Supp. 2d 692, 694 (S.D.N.Y. 2010); *United States v. Sheckley*, 129 F.3d 114 (2d Cir. 1997) ("We have explained that the determination of early release is a discretionary decision made by the district court.").

The Court of Appeals for the Second Circuit explained:

Section 3583(e) provides the district court with retained authority to revoke, discharge, or modify terms and conditions of supervised release following its initial imposition of a supervised release term in order to account for new or unforeseen circumstances. Occasionally, changed circumstances—for instance, exceptionally good behavior by the defendant or a downward turn in the defendant's ability to pay a fine or restitution imposed as conditions of release—will render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals of section 3553(a).

*United States v. Lussier*, 104 F.3d 32, 36 (2d Cir. 1997).  The appellate court's examples of grounds that may warrant early termination—"changed circumstances" and "exceptionally good behavior"—are not a limit on a district court's statutorily granted authority to terminate "if it is satisfied that such action is [1] warranted by the conduct of the defendant released and [2] the interest of justice." 18 U.S.C. § 3583(e)(1).

The Court of Appeals for the Second Circuit has declared that *Lussier* cannot be read to mandate additional requirements for termination or modification:

[Defendant] relies primarily on our decision in *United States v. Lussier,* 104 F.3d 32 (2d Cir. 1997), where we noted that a district court may modify conditions of supervised release "in order to account for new or unforeseen circumstances." *Id.* at 36. He contends that *Lussier* suggests that a modification of supervised release conditions cannot take place without some action by the defendant or a new circumstance in the defendant's life that arises after the original sentence was

imposed. However, this reasoning is contrary to the plain language of *Lussier,* which does not *require* new or changed circumstances relating to the defendant in order to modify conditions of release, but simply recognizes that changed circumstances may in some instances justify a modification. *See id.* So long as the court, when modifying supervised release conditions, considers the relevant 18 U.S.C. § 3553(a) sentencing factors, there is no additional requirement that it make a finding of new or changed circumstances with respect to the defendant.

*United States v. Parisi*, 821 F.3d 343, 347 (2d Cir. 2016) (emphasis in original).

## 2. Termination of Mandatory Minimum Periods

A district court may terminate supervised release before the expiration of a mandatory minimum period. As the Court of Appeals for the Seventh Circuit explained in *Pope v. Perdue*, 889 F.3d 410, 414 (7th Cir. 2018), 18 U.S.C. § 3583(a) requires a court to *impose* a minimum term of supervised release when it is required by another statute. For example, 21 U.S.C. § 841(b)(1)(C), at issue in the instant case, requires a three-year minimum term of supervised release for certain drug offenses. The "impos[tion] of a sentence," however, is distinct from *modification* or *termination* of a sentence, provided for in 18 U.S.C. § 3583(e)(1). *Id.* The *Pope* court concluded that Congress did not intend for "a minimum term of supervised release [ ] to constrain the court's ability to later terminate it." *Id.*

All courts, as far as this court is aware, agree with this position that early termination power exists even when a mandatory minimum was required. *See United States v. Spinelle*, 41 F.3d 1056, 1060 (6th Cir. 1994) ("[W]e hold that a district court has discretionary authority to terminate a term of supervised release after the completion of one year, pursuant to 18 U.S.C. § 3583(e)(1), even if the defendant was sentenced to a mandatory term of supervised release under 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 3583(a)."); *United States v. McClister, No. 02-CR-87, 2008 WL 153771* (D. Utah Jan. 14, 2008) (same); *United States v. Macklin*, No. 95-CR-11, 2009 WL 2486336 (E.D. Mo. Aug. 11, 2009) (same); U.S. Sentencing Commission, Federal Offenders

Sentenced to Supervised Release, at 35 (July 2010) ("[E]arly terminations may occur even in cases where a statute originally required the sentencing court to impose a term of supervised release in excess of one year.").

E. Supervised Release in the Age of Marijuana Legalization and Widespread Use

As state and federal law diverges, courts have grappled with supervisees who use marijuana. One option is to continue to place supervisees in federal prison for marijuana use. In *United States v. Hicks*, 722 F. Supp. 2d 829 (E.D. Mich. 2010), for example, the court found that the defendant's possession of marijuana, even if legal for medical purposes under state law, violated the conditions of his supervised release. The court explained: (1) marijuana remains illegal under federal law, and (2) "a court may restrict the otherwise legal behavior of a defendant on supervised release," such as alcohol use. *Id.* at 834-35.

Other courts have followed this path while expressing concern about the effect of punishing habitual marijuana users. *See, e.g.*, *United States v. Guess*, 216 F. Supp. 3d 689 (E.D. Va. 2016) (expressing concern about unequal enforcement of marijuana law and attendant sentencing disparities and sentencing a defendant to eight months incarceration for his marijuana use); *United States v. Friel*, 699 F. Supp. 2d 328, 330 (D. Me. 2010) ("[E]ven if marijuana could now legally be used for medicinal purposes, I would not permit Friel to use it in light of the drug trafficking risk he poses. It is not uncommon for people on supervised release to be restricted from activities that are legal for the rest of the population.").

Reviewing a district court's imposition of a term of incarceration for marijuana use, Judge Posner, writing for the Court of Appeals for the Seventh Circuit, explained the fundamental position that the power to imprison supervisees for marijuana use and the appropriateness of such punishment are distinct issues:

The defendant's problem is marijuana . . . we have our doubts that imprisonment is an appropriate treatment for a marijuana habit. . . . The 29 months that he served in prison beginning in 2009 did not break him of his habit; what is the basis for thinking that 14 more months in prison will? Maybe with a job and a family and greater maturity he'll outgrow it, or reduce his consumption to a level at which it has no significant behavior or psychological ill effects. The fact that he's impressed his employers suggests that he can function even with the habit, in which event it might have been better had the judge not imposed a prison sentence but instead had ordered a stricter regimen of treatment for the defendant's drug habit. . . .

The defendant disobeyed the terms of his supervised release repeatedly, but his current profile is not that of a dangerous criminal, and the utility of his continued imprisonment is difficult to see.

*United States v. Smith*, 770 F.3d 653, 656-57 (7th Cir. 2014).

Two recent district court opinions typify a reasonable approach to post-release supervision for marijuana users. In *United States v. Parker*, 219 F. Supp. 3d 183 (D.D.C. 2016) the court terminated supervision for a person using marijuana for medical reasons, while recognizing that marijuana use—even if permissible under state law—remains illegal as a matter of federal law. *Id*. at 188-89. But, because the defendant was serving a mandatory term of ten years of supervised release, a minimum no longer in effect, and had been otherwise compliant, the court terminated his supervision. *Id*. at 189-91; *see also United States v. Johnson*, 228 F. Supp. 3d 57, 62-64 (D.D.C. 2017) (terminating supervision for a defendant who had taken "affirmative steps to become a well-integrated member of the community" and used marijuana for medicinal purposes).

Because of the statutory requirement forcing courts to imprison many habitual marijuana users on supervised release, *see supra* Section III(B), courts may be faced with a binary choice: send marijuana users to jail or terminate supervision.

F.  Critiques of Supervised Release

1.  Overuse of Supervised Release

Supervised release is required by statute in less than half of all federal cases, but imposed

as a part of nearly every sentence.  Scott-Hayward, *supra*, at 192.  Between 2005 and 2009

courts imposed supervised release in 95% of cases.  U.S. Sentencing Commission, *Federal*

*Offenders Sentenced to Supervised Release*, at 55 (July 2010).  Judges in the Eastern District of

New York are in line with the federal average, imposing supervised release in 94% of cases.

Scott-Hayward, *supra* at 207.

> The criminal justice ecosystem largely ignores supervised release.
>
> Off the record conversations with a number of federal defenders (from both the Eastern and Southern Districts of New York) revealed that the perceived mandatory nature of supervised release is so entrenched that they do not even bother to fight its imposition, or even the length of a term.  One federal defender told me that if defense attorneys pay any attention to supervised release, they focus on the number and/or type of conditions imposed.  However, in none of the hearings observed for this study did any defense attorney make any objection of this type.

*Id.* at 209; *see also* Doherty, *supra*, at 1019 ("The Senate Report on the SRA assumed that judges

would reserve supervised release for select offenders who presented the greatest risks of

recidivism.  Today, nearly every single person who is sentenced to federal prison also receives a

term of supervised release.").

The average length of a supervised release terms has increased over time.  The Pew

Charitable Trusts, *Number of Offenders on Federal Supervised Release Hits All-Time High* (Jan.

24, 2017).  In 2015, the average term of supervised release was 47.1 months, up 12% from the

average length of 42.1 months in 1995.  *Id.* at 2.

The combination of supervised release being imposed in nearly every case with

increasingly long terms has greatly expanded the total supervised population.  *Id.*  The number of

federal supervisees has had a near three-fold increase in two-decade period between 1995 and 2000—from 39,000 people to nearly 115,000.  *Id.*

### 2.   Negative Consequences

The current reflexive use of longer than needed supervised release periods may increase the likelihood of recidivism.  Scott-Hayward, *supra*, at 217.

> Not only is there no increase in recidivism rates when low-risk people are not supervised, requiring low-risk people to participate in the treatment and other programs common to post-prison supervision can actually *increase the likelihood that they will reoffend*.  While it is not clear exactly why this occurs, possible reasons include the fact that supervising low-risk people and placing them in programs can disrupt their pro-social networks, as well as the fact the increased supervision and the associate conditions increase the likelihood of violations.

*Id.* (emphasis added); *see also* Doherty, *supra*, at 1019 (noting that supervised release may brand supervisees as "belonging to a criminal class" which can undermine reintegration); The Pew Charitable Trusts, *supra*, at 3 ("[E]xtended periods of community supervision can have negative consequences for offenders and the public. One common result is that more offenders are sent to prison for violating the terms of their supervision (known as technical violations) than for new crimes. More than two-thirds of all federal offenders who are revoked from supervised release each year committed technical violations but were not convicted of new crimes.").

Evidence suggests that increasing the length of supervised release does not necessarily lower levels of recidivism.  U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, at 15 (March 2016).  The Sentencing Commission found that while the rearrest rate for offenders was 16.6% within the first year of being released, this rate dropped to 6.6% three years after release and 1.8% eight years after release.  *Id.*

For some, supervised release can be a trap where they bounce between supervision and prison.  "Violations of [supervised release] frequently cause a return to prison, often with new

supervisory terms attached.  This has created the 'threat of never-ending supervision.'"  Nora V.

Demleitner, *How to Change the Philosophy and Practice of Probation and Supervised Release:*

*Data Analytics, Cost Control, Focus on Reentry, and a Clear Mission*, 28 Fed. Sent'g Rep. 231,

232 (2016).  As a result, a form of indeterminate sentencing has been reintroduced into the

federal system.  *See generally* Fiona Doherty, *Indeterminate Sentencing Returns: The Invention*

*of Supervised Release*, 88 N.Y.U. L. Rev. 958 (2013); *supra* Section III(B)

      3.  Proposals for Change

There are short-term and long-term solutions to some of the problems presently posed by

supervised release.

> First, judges could impose [supervised release] only in cases where warranted, which
> means when the offender needs supervision to assist with reintegration and to provide
> control.  Second, they could limit the number of probation conditions by selecting only
> those discretionary conditions that are most appropriate to the individual offender.  *Thirdly,*
> *they could terminate [supervised release] early*.  These three sets of decisions would
> decrease the potential for violations while allowing the court and the probation team to
> focus on higher-risk individual offenders.  Those persons should have individualized
> requirements imposed and supervision provided to help prevent recidivism and assist
> rehabilitation.  Although initially more work for a judge, in the long run such thoughtful
> decisions may decrease the need for judicial intervention and sanctions.

Demleitner, *supra*, at 233 (emphasis added).  "Federal judges may need to begin to focus on

questions of whether to impose [supervised release], for how long, and what discretionary

conditions to attach.  Decreases in length and conditions would likely result in a substantial

decline in the number of revocations."  *Id.*

It has been suggested that courts should tailor the conditions of supervised release for

each defendant:

> Courts should make individualized determinations about what conditions should
> apply in each case.  In evaluating the utility of any particular defendant, courts
> should distinguish between conditions that are aimed simply at establishing control
> over "criminals" and conditions that provide reintegrative services, such as job-
> training or mental health treatment.  They should consider the regulatory and

administrative costs of any condition they impose and require proof that this condition will actually lead to some desired societal goal.

Doherty, *supra*, at 1025. Conditions could be linked to incentives and sanctions, instead of the threat of incarceration, in an effort to encourage rehabilitative behavior. *Id.* at 1026. Judges have begun to call for such options. *See supra* Section III(B).

Professor Scott-Hayward suggests that the end of a prison term would be a better time to impose a sentence of supervised release because judges would have greater insight into the defendant's potential for rehabilitation. Scott-Hayward, *supra*, at 222. Judges would be able to more accurately make a prediction about the future risks a defendant poses and whether he or she should be subject to an extensive supervised release term. *Id.*; *Cf. Siegel*, 753 F.3d at 708 ("Because conditions of supervised release, though imposed at sentencing, do not become operational until the defendant is released, the judge has to guess what conditions are likely to make sense when the defendant is released.").

A court's ability to terminate supervision early, *see supra* Section III(D), or modify conditions, *see supra* Section III(C)(5), provides an option to reevaluate the efficacy of a supervised release term throughout its duration. It can be used to effectuate Professor Scott-Hayward's proposal, determining whether continued supervision is appropriate with greater information than the court has *ex ante* at the sentencing hearing.

4. Probation Department Reforms

The Probation Department has taken measures to mitigate over-supervision. Supervision is more intense in the early years and then tapers off, if this change is appropriate in the case. A "Low Intensity Unit" was created in this district to reduce burdens for some. *See* E.D.N.Y. Probation Department, Low Intensity Unit (LIU) Policy and Procedures.

> One of the goals of this program is to permit supervision officers to focus their time and efforts on . . . cases in need of closer supervision, while relieving them of cases that require little supervision. . . . When the assessment indicates that . . . the offender is likely to remain crime free and to comply with all other conditions without further interventions by the officer, the case should be supervised under . . . low intensity standards. . . . Working smart means never supervising offenders more intrusively than required by their assessed risks and needs at any given time.

*Id.* (Internal quotation marks omitted).

Some supervisees, such as sex offenders, are ineligible for the program. *Id.* A supervisee must go six months without a positive drug test to qualify. *Id.* Whether this limit is a hard-and-fast rule for all cases is not clear.

The Probation Department also recommends early termination in appropriate cases. Consistent with case law, *see supra* Section III(D), Probation Department policy states:

> It is a common misconception that early termination under §3583(e)(1) must be based on an offender's significantly changed circumstances or extraordinarily good performance under supervision. The offender's conduct while under supervision is only one of many factors that a district judge must consider . . . . [A] court must simply be satisfied that the termination is warranted and is in the interest of justice. . . . [O]fficers may recommend that a district court terminate a supervision term prior to its predicted expiration date.

*See* Letter from Joe Gergits, Assistant General Counsel for the Administrative Office of the United States Courts to Ellie N. Hayase Asasaki, United States Probation (July 20, 2009).

IV.    Application of Law to Facts

"The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583.

This provision is infrequently raised in applications by defense counsel or the Probation Department.  Since the judge would not ordinarily examine the case on his or her own motion, unless a violation is charged, the provision is seldom used.  Automatically raising the issue in all cases after one year should be considered.  Such a plan would probably generally increase early terminations.

A.  3553(a) Factors

Trotter was an adolescent when he committed the crime that led to his term of imprisonment and supervision.  He comes from a broken home.  The hardships that he has faced, his long-term habitual marijuana use, and his urge to rehabilitate suggest avoiding a long period of supervision.

Continued supervision will probably interfere with his rehabilitation.  He may needlessly be placed in prison.  Extended supervision is unlikely to have any deterrent effect on him personally or on the public generally.  As he transitions from adolescence to adulthood, family and community support can help him.

B.  Conduct of Defendant and Interests of Justice

Since his release from jail, Trotter has not committed any crimes, apart from his habitual marijuana use.  Hr'g Tr. 3:3-21.  He has been working.  *Id.*  At the hearing Trotter presented the court with his current resume and a flyer from a career fair he recently attended.  *See* Ct. Ex. 1-2. With support of friends and family, he is likely to lead a productive, law-abiding life.

Continued supervision is unlikely to help rehabilitate Trotter.  His marijuana habit, developed at a young age, is unlikely to disappear except as time and mature responsibilities put pressure on him to stop.  He has no desire to stop at this time.  *See* Hr'g Tr. 9:2-4 ("Marijuana

usage may not be right, but . . . it's keeping me calm and on the right path.").  This habit will lead to conflict between Trotter and his probation supervisor.

If his supervision continues, he will probably end up in the almost endless cycle of supervised release and prison.  Because the revocation statute requires jail time for drug use, *see supra* Section III(B), he is likely to be sent back to prison, to be followed by a term of supervised release, which, when violated, will again send him back to prison.

V.     Conclusion

Trotter's term of supervised release is terminated forthwith pursuant to 18 U.S.C. § 3583(e)(1).  Continued supervision would not serve the rehabilitative goal of supervised release.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: July 5, 2018
        Brooklyn, New York